UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| XIOMARA B. TONG-ALBIZURES, ) | CASE NO. 1:12CV64 |
| ) | |
| Plaintiff, ) | JUDGE PATRICIA A. GAUGHAN |
| ) | |
| v. ) | Magistrate Judge George J. Limbert |
| ) | |
| MICHAEL J. ASTRUE, ) | **REPORT AND RECOMMENDATION** |
| COMMISSIONER OF ) | **OF MAGISTRATE JUDGE** |
| SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

Xiomara B. Tong Albizures ("Plaintiff") seeks judicial review of the final decision of Michael J. Astrue ("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying her application for Disability Insurance Benefits ("DIB"). ECF Dkt. #1. For the following reasons, the undersigned recommends that the Court AFFIRM the Commissioner's decision and dismiss Plaintiff's complaint with prejudice:

I. **PROCEDURAL AND FACTUAL HISTORY**

On April 13, 2007, Plaintiff applied for DIB, alleging disability beginning September 1, 2006.[1] Tr. at 80-86, 98. Plaintiff's date last insured was December 31, 2011. Tr. at 11, 98. The SSA denied Plaintiff's application initially and on reconsideration. Tr. at 70-75. On February 11, 2008, Plaintiff filed a request for an administrative hearing. Tr. at 76. On March 9, 2010, an ALJ conducted an administrative hearing where Plaintiff was represented by counsel. Tr. at 24-65. At the hearing, the ALJ accepted the testimony of Plaintiff and Kathleen Reis, a vocational expert

---

[1]Plaintiff's alleged onset date coincides with the date she was fired from a previous job for punching a co-worker. Tr. at 102.

("VE"). On August 3, 2010, the ALJ issued a Decision denying benefits. Tr. at 8-23. Plaintiff filed a request for review, and, on November 7, 2011, the Appeals Council denied Plaintiff's request for review. Tr. at 1-3.

On January 11, 2012, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On August 28, , 2012, with leave of the Court, Plaintiff filed a brief on the merits. ECF Dkt. #11. On October 10, 2012, Defendant filed a brief on the merits. ECF Dkt. #12. No reply brief was filed.

**II.**     **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff suffered from asthma and status post peritonitis, which qualified as severe impairments under 20 C.F.R. §§404.1520(c) and 416.920(c). Tr. at 14. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§404.1520(d), 404.1525, 404.1526, 416.920(d), and 416.926 ("Listings"). Tr. at 15.

The ALJ concluded that Plaintiff has the residual functional capacity to perform all basic work activities described in 20 C.F.R. §§404.1521, 404.1545, 416.921 and 416.945 within the following parameters: Plaintiff can lift/carry up to five pounds frequently and up to ten pounds occasionally, and she can stand and/or walk with normal breaks for about two hours in an eight-hour period. Plaintiff can occasionally reach overhead, and, she can occasionally climb stairs/ramps, balance, bend, stoop, kneel, and crawl.  However, Plaintiff cannot work around hazards or pulmonary irritants. Tr. at 16.

The ALJ further concluded that Plaintiff had been able to work within the foregoing parameters so long as she was afforded a sit-stand option every hour that allowed her to alternate between sitting and being on her feet, at her option, to relieve pain and discomfort.  The ALJ ultimately concluded that Plaintiff has the residual functional capacity to perform a full range of unskilled sedentary work with the foregoing additional limitations, including the representative occupations of food and beverage clerk, telephone quote clerk, and charge account clerk. Tr. at 18.

### III. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

### IV. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).

## V.    SUMMARY OF TESTIMONY

Plaintiff, who was forty-one years of age at the hearing, testified that she is married with four children, whose ages range from twelve to twenty-two. Tr. at 28-29. Her husband is currently laid-off. Plaintiff completed the ninth grade. Tr. at 30.

Plaintiff's medical problems began after she underwent a hysterectomy and partial oophorectomy (right ovary) to address abdominal pain. Tr. at 38. Approximately nine months later, Plaintiff's left ovary was removed when tumors were discovered in the left ovary. Tr. at 39. A drain had to be inserted because Plaintiff developed an infection. Then, Plaintiff developed a hernia. The physician who removed the hernia inserted mesh in Plaintiff's stomach in order to prevent future hernias. However, Plaintiff's intestines became attached to the mesh.

Plaintiff continued to experience pain. She was diagnosed with an inflamed appendix. During the surgery, her physician also removed a portion of her intestine that was attached to the mesh. Two days later, Plaintiff returned to the hospital for emergency surgery because the surgeon had perforated her remaining intestine. Tr. at 40. Despite the foregoing efforts to separate Plaintiff's intestines from the mesh, a CT scan revealed that her bladder and intestine are again attached to the mesh. Dr. Michael Rosen suggested removing a portion of her bladder and intestine, which would require the use of a colostomy bag. Tr. at 40-41. However, he cautioned her that the surgery is dangerous, and she should consider pain management first and surgery as a last resort.

As a consequence, Plaintiff takes pain medication and Zoloft for the distress she experiences regarding her medical problems. Plaintiff rises at 7:30 a.m. with her children but returns to bed after they leave for school. She sleeps until 10:00 a.m. when she lets the dog out and feeds him Tr. at 33. Most days, she stays at home and lays in bed all day. She fixes lunch with her husband's assistance. Tr. at 35. She is able to sit on the floor and play with her grandson when he visits. Tr. at 32.

Plaintiff prepares meals and can load the dish washer and wash clothes, although her son carries the clothes basket for her. Tr. at 30-31. Her children vacuum the house. Plaintiff shops for groceries, although she cannot push the cart, because she carries a machine with her that gives her "electric shocks to the pain." Tr. at 31. The machine helps her "a little bit" but she experiences a constant numbness and tingling as a side effect of the machine. Tr. at 31-32. Plaintiff does not drive because her medication makes her dizzy and she sometimes loses her balance. Tr. at 29.

Plaintiff testified that she can lift a gallon of milk, she can stand for fifteen minutes, she could walk "from here to the parking lot," and she has trouble with steps. Tr. at 45. Her stress causes seizures, although she did not indicate how often the seizures occur. She cannot bend at the waist or stretch because it pulls on the mesh. Tr. at 46. She explained that the pain worsened in June of 2009, which is when she discovered that her bladder is attached to the mesh. Tr. at 50. Since that time, she has difficulty urinating and passing stool.

Plaintiff worked at several jobs after her onset date. She worked for two temporary agencies in 2008, where she was required to lift twenty to thirty pounds. Tr. at 35-38. She also drove a tow motor, and worked on an assembly line. Tr. at 38. When asked why she stopped working, Plaintiff explained that she was terminated "because there were no more jobs." Tr. at 36. When asked about her job performance, she said she was "doing really good." Tr. at 36.

## VI.     SUMMARY OF MEDICAL TESTIMONY

The medical record in this case provides a more detailed description of Plaintiff's series of surgeries. Plaintiff began expressing concerns to her primary care physician, Olga Kovacevic, M.D., about breast and pelvic pain and amenorrhea in 2004. Her test results were normal and she was referred to a physician to rule out endometriosis. Tr. at 316-17.

On March 30, 2005, Plaintiff told Dr. Kovacevic that she believed that she had exercise

induced asthma. She had no asthma symptoms in the last eight years, but she developed some wheezing and shortness of breath since she started her exercise program. Tr. at 314. Dr. Kovacevic prescribed Advair Tr. at 311. Dr. Kovacevic diagnosed Plaintiff with exercise-induced asthma with slight wheezing, but reported that Plaintiff responded well to Advair and had no limitations. Tr. at 259-60.

In mid-2005, Plaintiff underwent a vaginal hysterectomy and a partial oophorectomy (right ovary). Tr. 229-30. Beginning in June 2005, she began follow-up treatment at the Oak Tree Women's Health, where she complained about intermittent abdominal pain. Tr. at 226-32.

On June 8, 2006, Plaintiff went to the Southwest General Health Center emergency room because of abdominal pain with nausea and vomiting. The examination revealed tenderness in her right lower quadrant. Tr. at 183. A CT scan of her abdomen and pelvis showed a cyst on the left side, but a normal liver, pancreas, spleen, adrenal gland, kidney, and appendix. Tr. at 185-86. On July 11, 2006, Dr. Kimberly Kraus conducted an exploratory laparotomy, which resulted with the lysis of adhesions and the removal of Plaintiff's left ovary. Tr. at 189, 190-91.

On July 16, 2006, Plaintiff returned to the hospital because of lower abdominal pain following the surgery. Although she reported pain on the right side, she was diagnosed with a left pelvic abscess. Tr. at 192-196, 198. The abscess was successfully drained. Tr. at 202-207. On September 28, 2006, a CT scan of her abdomen and pelvis showed that the abscess resolved, but there was a midline hernia in the lower abdominal wall. Tr. at 210.

Plaintiff continued treatment with Dr. Kraus and reported continued pain following the surgery. Dr. Kraus opined that the pain was likely related to the adhesions and felt that Plaintiff may need further exploratory surgery. Tr. at 217-25. On October 26, 2006, although Plaintiff complained of abdominal pain mostly on the right that sometimes radiated down her back and left leg, she admitted that she was not taking anything for pain, not even Tylenol. She also had no nausea or vomiting. She stated that she had pain when Dr. Kraus touched her abdomen, but she showed no rebound or guarding. Dr. Kraus concluded that the exam was benign. Tr. 214. On November 16, 2006, Dr. Kenneth Lee at Fairview Hospital conducted an incisional hernia repair, which included the insertion of mesh. Tr. at 267-268.

-6-

Plaintiff underwent a psychological evaluation administered by consultative examiner Dr. James Sunbury, Ph.D. on December 3, 2007. She reported that her main medical problems stemmed from multiple surgeries that "didn't go well." Tr. 362. It was noted that while Plaintiff had not participated in any counseling, she was taking Zoloft to control depression. She described the anger issues she experienced when she was not on her medication. Tr. 363. Plaintiff also mentioned a history of seizures, asthma, and intestinal problems. Dr. Sunbury noted that Plaintiff's intellectual functioning was estimated within the low-average to borderline range. Regarding insight and judgment, Dr. Sunbury noted that her insight and judgment seemed low-average. Tr. 364. At Axis I, Plaintiff was diagnosed with Depressive Disorder, NOS and she was assigned a GAF of 60. Tr. 365. Dr. Sunbury concluded that Plaintiff exhibited mild impairments in her ability to understand and follow instructions, maintain attention to perform simple repetitive tasks, relate to others including fellow workers and supervisors. He stated that symptoms of depression and histrionic personality features would likely impair her ability to withstand the stress and pressures associated with day to day work activity.

On December 21, 2007, more than a year after her last previous report of abdominal pain, Plaintiff went to the Fairview Hospital Emergency Department, complaining of right lower abdominal pain. She stated that her pain went up to seven, but then would resolve to zero. The examination showed that there was no bowel obstruction, appendicitis, or kidney stones. The emergency room physician concluded, "All systems reviewed and are negative or noncontributory to the above chief complaint." The hospital discharged her in good condition. Tr. at 393-94.

Another year passed, and on February 28, 2009, Plaintiff went to the Medina General Hospital emergency room, reporting flank pain with nausea. A CT scan of her abdomen, pelvis, and flank showed a tiny calculus (kidney stone) in her right proximal ureter without obstruction. Her appendix, liver, spleen, pancreas, and aorta were normal, and she had no GI abnormality or acute pelvic pathology. The examination showed no tenderness in her abdomen and normal bowel sounds and functioning, but she did report frequent and burning urination. The hospital discharged her with a prescription for Percocet. Tr. at 508-26, 531.

On March 3, 2009, Plaintiff returned to the emergency room, again complaining of

abdominal and flank pain. However, the examination showed that her abdomen was non-tender, and she had normal bowel sounds and urination. An x-ray for kidney stones was unremarkable. The hospital discharged her with a prescription for Vicodin. Tr. at 487-507 . On March 17, 2009, Plaintiff returned to the emergency for a third time, complaining of back and abdominal pain. The hospital admitted her for a possible kidney stone, but a pelvic and abdominal CT scan showed that the tiny calculus in her right ureter was no longer present. Her condition improved and the hospital discharged her with a prescription for pain relief. Tr. at 464-83. On March 21, 2009, Plaintiff returned to the emergency room. She reported vomiting and abdominal pain. Her condition quickly improved and she was discharged. Tr. at 447-58.

In June of 2009, Plaintiff began seeing Dr. Susan M. Goodrich and Dr. Warren W. Rose of Surgical Associates. Tr. at 405. Dr. Rose opined that Plaintiff might have a hernia, but her discomfort more likely came from intra-abdominal post surgical changes. He recommended a laparoscopic exploration, lysis of adhesions, and hernia repair if a hernia was discovered. Tr. at 404. On July 9, 2009, Dr. Rose performed a laparoscopic exploration, incidental appendectomy, lysis of adhesions, and excision of a scalp lesion. Tr. 429-30.

On July 12, 2009, Plaintiff returned to the emergency room, reporting nausea, vomiting, and diarrhea. She was diagnosed with peritonitis and she underwent a small bowel enterotomy repair. She was stable and discharged with pain medications. Tr. at 427-28.

On July 21, 2009, Plaintiff reported to Dr. Goodrich that she was having difficulty moving her bowels. Dr. Goodrich told her to take an over-the-counter stool softener. Tr. at 402. On July 27, 2009, Dr. Goodrich found that Plaintiff was "generally doing well." Although she reported some pain with bowel movements and urination, her movements were regular and her appetite was good. Dr. Goodrich found only "diffuse mild tenderness" in Plaintiff's abdomen. She recommended that Plaintiff drink fluids and she prescribed Darvocet for pain control. Tr. at 406.

On August 3, 2009, Plaintiff returned to Dr. Goodrich. Although Plaintiff reported right lower quadrant pain, she was "slowly improving." Tr. at 407. Dr. Goodrich's examination showed that "[t]here is tenderness overlying the left upper abdominal incision, but there is no evidence of herniation, seroma, or hematoma formation. No ecchymoses. There is also tenderness in the right

lower quadrant but no palpable masses." Tr. at 407. She prescribed Ultram because Plaintiff reported that the Darvocet was not effective. Tr. at 407.

On August 24, 2009, Plaintiff returned to Dr. Goodrich, complaining of bilateral lower quadrant abdominal pain, which worsened with eating. She was having bowel movements one to three times per day. Plaintiff described pain with urination and bowel movements. Dr. Goodrich found that the Plaintiff's abdomen tenderness was in the area of the "tack sites" of her implanted mesh. She gave Plaintiff an injection for pain relief. Tr. at 412. Dr. Goodrich referred Plaintiff to "Dr. Kareti" for pain management, and prescribed Ibuprofen and Valium.

On September 15, 2009, Plaintiff continued to complain of left lower quadrant pain, especially when lying on her left side. Tr. at 409. Dr. Goodrich found some diffuse tenderness, but mainly down in Plaintiff's right lower quadrant. Dr. Goodrich gave Plaintiff another injection and a pain medication prescription. Plaintiff indicated that she could not schedule an appointment with Dr. Kareti due to her lack of insurance. Tr. at 409. Dr. Goodrich prescribed Bentyl.

One week later, on September 22, 2009, Plaintiff returned to Dr. Goodrich and denied improvement from the pain medication and injections. Dr. Goodrich found diffuse tenderness on the perimeter of Plaintiff's abdomen at the tack sites. Dr. Goodrich ordered a CT scan of Plaintiff's abdomen and pelvis, and, if the CT scan was negative, Dr. Goodrich noted her intent to refer Plaintiff to Dr. Rosen at University Hospital to consider mesh removal. Tr. at 410. Dr. Goodrich prescribed Xanax in order to address personal stresses as well as chronic pain.

On September 24, 2009, Plaintiff had a pelvic CT scan. The CT scan showed a small ventral hernia and no mass lesions or significant adenopathy. The abdominal CT scan showed a normal liver and spleen, no significant adenopathy, and a right-sided calcification with no renal obstruction, which was unchanged from the previous examination. Tr. at 426.

Dr. Kovacevic submitted an undated questionnaire stating that she last saw Plaintiff on May 30, 2007. Plaintiff complained of chronic pain, resulting in hernia surgery in 2006. Dr. Kovacevic advised that Plaintiff avoid lifting, pushing, or pulling anything over 20 pounds, but limited the restrictions to one month following surgery. Tr. 264-65. On October 2007, Plaintiff's gynecologist, Dr. Jonathan R. Funk, stated that Plaintiff experienced pelvic discomfort, but the pelvic ultrasound

-9-

was negative. He concluded that Plaintiff had no current limitations. Tr. at 271-72.

On February 17, 2010, Dr. Goodrich wrote a "to whom it may concern" letter. She described Plaintiff's surgical history and concluded, "From my experience and interaction with the patient from July to October 2009, her symptoms were prohibitive to her doing any type of activity which would require any type of lifting, repetitive motions of going up, down, or excessive walking, or even sitting in a single spot." Dr. Goodrich referred the reader to "Dr. Rosen," presumably the physician that Plaintiff consulted regarding the removal of the mesh from her abdomen, "who would be able to provide more details" Tr. at 438. There are no medical notes from Dr. Rosen in the record.

## VII. ANALYSIS

Plaintiff advances two arguments in this appeal. First, Plaintiff contends that the ALJ did not perform a proper analysis of the evidence in this case. Next, Plaintiff contends that the ALJ erred in concluding that she performed disqualifying substantial gainful employment after her alleged onset date.

Plaintiff's first argument stems from the fact that the ALJ did not engage in a typical restatement of Plaintiff's medical history and hearing testimony prior to reaching her conclusion that Plaintiff was not disabled at step five. However, the ALJ provided the following assessment of Plaintiff's allegations of disabling pain, with references to the medical record set off in footnotes:

> [T]he undersigned first notes that an inability to work without symptoms such as stomach pain, by itself, does not equate to one being under a "disability" as that term is defined by law. The undersigned also notes that the objective medical evidence does not support Ms. Tong-Albizures' allegation that she has had disabling symptoms since the September 1, 2006 alleged onset date. More specifically, Ms. Tong-Albizures' medical records do not show, ongoing, significant pathology over any continuous 12-month period since September 1, 2006. In assessing Ms. Tong-Albizures' residual functional capacity and her overall credibility, the undersigned has also taken into consideration the fact that significant side effects from medications are not mentioned in Ms. Tong-Albizures' medical records over any continuous 12-month period since the September 1, 2006 alleged onset date. The undersigned is also taking into consideration the fact that the record shows that Ms. Tong-Albizures has been able to engage in a fairly wide range of activities since September 1, 2006 that are incompatible with an individual having disabling symptoms. In assessing Ms. Tong-Albizures' residual functional capacity since September 1, 2006, the undersigned also notes that no medical source has indicated that Ms. Tong-Albizures would have any work-related restrictions over any continuous 12-month period since September 1, 2006. In assessing Ms. Tong-Albizures' residual functional capacity, the undersigned has also taken into

> consideration the fact that Ms. Tong-Albizures has engaged in substantial gainful activity since September 1, 2006.

Tr. at 17.

Despite the ALJ's failure to recount Plaintiff's medical history and her testimony at the hearing, the ALJ nonetheless provides a detailed explanation for her conclusion that Plaintiff is not disabled. Simply stated, the ALJ interpreted the medical record in this case as establishing a series of short-term, post-surgical time frames when Plaintiff was incapable of work, as reflected in the medical statements of Drs. Kovacevic and Funk. Accordingly, the undersigned recommends that the ALJ performed a proper analysis of the record in this case.

Next, Plaintiff contends that the ALJ incorrectly concluded that the record contained no statement of a medical source that Plaintiff has any work restrictions. Plaintiff relies on Dr. Goodrich's "To Whom It May Concern" letter to demonstrate that, as a result of her ongoing pain, she is incapable of performing work activity involving lifting, repetitive movement, excessive walking, or sitting in a single spot. However, Dr. Goodrich's letter, which is dated February 17, 2010, reads, in pertinent part, "From my experience and interaction with the patient from July to October of 2009, her symptoms were prohibitive of her doing any type of activity which would require any type of lifting, repetitive motions of going up, down, or excessive walking, or even sitting in a single spot." Dr. Goodrich continued, "To my knowledge, she is currently following up with Dr. Rosen who would be able to provide more details." Tr. at 438. The ALJ interpreted the letter to provide an assessment of Plaintiff's limitations for the post-operative period identified in the letter. Because Dr. Goodrich encourages the reader to consider the opinion of Dr. Rosen (which was not provided), the undersigned recommends that the Court find that the ALJ did not err in concluding that Dr. Goodrich's assessment was limited to the three-month treatment period.

Finally, Plaintiff contends that the ALJ erred in concluding that her employment from October 1, 2007 to September 30, 2008 constituted disqualifying substantial gainful activity. Although the ALJ characterized Plaintiff's employment during that time frame as disqualifying substantial gainful activity, Tr. at 13, she nonetheless continued her analysis and concluded at step five that Plaintiff was not disabled. See Tr. at 16, note 16. In other words, the ALJ did not predicate

her conclusion that Plaintiff was not disabled solely upon Plaintiff's employment from 2007 to 2008. Moreover, regardless of whether Plaintiff's employment constituted disqualifying substantial gainful activity, it was appropriate for the ALJ to rely upon such activity to establish that Plaintiff's daily activities were, at times following the alleged onset date , greater than she reported.

## VIII. CONCLUSION

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the Commissioner's decision and dismiss Plaintiff's complaint with prejudice:

DATE: November 28, 2012

                                              */s/George J. Limbert*
                                              GEORGE J. LIMBERT
                                              UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).